IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:22CR165 |
| vs. | |
| CHRISTOPHER FRATER, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress ([Filing No. 30](Filing No. 30)).  An evidentiary hearing regarding this matter was held on February 22, 2023.  A transcript has been filed and the motion is ripe for disposition.

For the reasons explained below, the undersigned will recommend that the Motion be denied.

### FACTS

On July 13, 2022, around 10:17 a.m., Omaha Police Officer Matthew Keenan ("Officer Keenan") was on patrol on I-80 in Sarpy County, Nebraska.  (Ex. 1; Ex. 2.)  Officer Keenan has been with the Omaha Police Department for twenty-one years.  (TR. 7.)  He has been a member of the Omaha Police K-9 Unit and the Omaha metro area interdiction team for three years.  (TR. 7.) As Officer Keenan was traveling eastbound on I-80 near mile-marker 435, he observed a 2021 silver Nissan Maxima with Virginia license plates traveling eastbound.  (TR. 7-8; TR. 29.)  Officer Keenan testified he observed the Maxima move from the middle lane to the far-right lane, and then hit the solid white line as he was in the far-right lane.  (TR. 8-9.)  The Maxima then went back to

the number two lane. (TR. 8.) Officer Keenan testified that the Maxima did not signal its lane changes all the way through both of the lane changes. (TR. 8.)

Officer Keenan proceeded to conduct a traffic stop on the Maxima. (TR. 8.) The traffic stop occurred at mile-marker 436. (Ex. 1; Ex. 2.) At the time of the stop, Officer Keenan's cruiser was equipped with a recording system. (TR. 10; Ex. 1.) Officer Keenan also was wearing a body camera. (TR. 10; Ex. 2.) Officer Keenan approached the Maxima on the passenger side and Defendant, who was the driver of the Maxima, provided him with his Ontario, Canada driver's license. (TR. 9; Ex, 1; Ex. 2.) Officer Keenan testified that he did not smell the odor of narcotics and did not see narcotics in plain view in the Maxima. (TR. 24.) Officer Keenan explained the reason for the traffic stop and requested the vehicle's paperwork, which included a rental agreement. (TR. 9; Ex. 3.) Defendant fumbled to provide the rental agreement to Officer Keenan because he could not find it. (TR. 9.) The rental agreement was sitting in Defendant's lap in plain view, which Officer Keenan had to point out to Defendant so he could give it to him. (TR. 9; Ex. 2.) Officer Keenan asked Defendant where he was going, and Defendant responded he was going to New York. (Ex. 2.) While difficult to hear from the recording of the traffic stop alongside the road, Officer Keenan testified that Defendant told him he was coming from Las Vegas and that he had gone to visit his cousin in California. (TR. 12; Ex. 2.)

Officer Keenan testified that he looked at the rental agreement as he was speaking to Defendant along the roadway and noted Defendant rented the Maxima at 11:10 p.m. on July 11, 2022 at Los Angeles International Airport ("LAX"), and that the vehicle was due back to LaGuardia Airport by 7:30 p.m. on July 15, 2022. (TR. 13; Ex. 3.) The car rental cost $1005.74. (Ex. 3.) Officer Keenan asked Defendant to accompany him back to his cruiser and told Defendant he would "get him out of here" with a warning. (TR. 13; Ex. 2.) Defendant exited the Maxima and sat in the front seat of the cruiser. (TR. 13; Ex. 1; Ex. 2.)

In the cruiser, Officer Keenan examined Defendant's driver's license and paperwork, and asked Defendant more about his travel plans and itinerary. (TR. 13; TR. 25-26; Ex. 1; Ex. 2.) Defendant said he was coming from Inglewood, California, where his cousin lived. (Ex. 1; Ex. 2.) He indicated he and his cousin stopped in Las Vegas, and then his cousin went home. (Ex. 1; Ex. 2.) Defendant told Officer Keenan that he lived in Ontario, Canada, but that he flew from Canada to Los Angeles. (Ex. 1; Ex. 2.) Defendant told Officer Keenan that he stayed in California for

three days, but immediately corrected himself and said he was only there for two days. (TR. 14; Ex. 1; Ex. 2.) Defendant told Officer Keenan that he had never met his cousin, but they talked online, so he decided to come visit him. (TR. 14; Ex. 1; Ex. 2.) Defendant explained that he was currently on his way to Mt. Vernon, New York to see other cousins. (Ex. 1; Ex. 2.) Defendant indicated he was going to fly back to Canada from New York. (Ex. 1; Ex. 2.)

Defendant told Officer Keenan that he left Inglewood, California the morning of July 12, 2022, but he had stopped at a rest area and slept for about four to five hours. (TR. 19-20; Ex. 1; Ex. 2.) Officer Keenan asked Defendant how long he had stayed in Las Vegas, and Defendant responded he stopped there for a couple of hours. (TR. 15; Ex. 1; Ex. 2.) Defendant explained he had never been to Las Vegas or California and that the drive to New York gave him the chance to see canyons and things he had only seen in video games and online. (Ex. 1; Ex. 2.) Defendant said it was worth the drive. (Ex. 1; Ex. 2.) Officer Keenan asked Defendant what he did for a living and Defendant told him he owned an "exotic" snack store and did some construction. (Ex. 1; Ex. 2.)

Officer Keenan asked Defendant why he did not fly from Los Angeles to New York, if he flew from Canada to Los Angeles. (Ex. 1; Ex. 2.) Defendant replied that he liked to drive. (TR. 15; Ex. 1; Ex. 2.) Officer Keenan also asked Defendant why he did not drive from Canada to Inglewood, California. (Ex. 1; Ex. 2.) In response, Defendant told Officer Keenan that it was too far. (TR. 15; Ex. 1; Ex. 2.) Defendant also told Officer Keenan that he was probably going to stop at a hotel on his way to New York but did not have a reservation. (Ex. 1; Ex. 2.) Officer Keenan provided Defendant's driver's license information to dispatch while they were in the cruiser. (Ex. 1; Ex. 2.)

Officer Keenan asked Defendant when he flew from Canada to California, and Defendant indicated he had left Canada on Monday, which would have been July 11, 2022. (TR. 14; Ex. 1; Ex. 2.) Defendant stated he had flown one-way without any stops. (Ex. 1; Ex. 2.) Defendant told Officer Keenan that while he was in Inglewood, he went to the beach with his cousin and then they decided to go to Las Vegas to see the strip. (TR. 14; Ex. 1; Ex. 2.) Officer Keenan told Defendant that he had gone on a short trip, and Defendant told him he only had a week off work. (Ex. 1; Ex. 2.) Defendant told Officer Keenan that he did not stay with his cousin while he was in Inglewood, and that he stayed in a hotel. (Ex. 1; Ex. 2.) Defendant could not remember the exact name of the

3

hotel where he stayed. (Ex. 1; Ex. 2.) Officer Keenan asked Defendant why he did not stay with his cousin, and Defendant explained that when he landed, he told his cousin he would just get a hotel and that they agreed to meet the next morning. (Ex. 1; Ex. 2.) Officer Keenan told Defendant that he was "scratching his head" as to why Defendant decided to drive back to New York when he flew to Los Angeles. (Ex. 1; Ex. 2.) Officer Keenan asked Defendant why he did not just drive the entire trip. (Ex. 1; Ex. 2.) Defendant indicated that driving both ways would have been too long, so he decided to drive to New York. (Ex. 1; Ex. 2; TR. 34.) From New York, Defendant was going to fly back to Canada. (Ex. 1; Ex. 2; TR. 34.)

Approximately fourteen minutes into the stop, Officer Keenan told Defendant he was going to get a warning citation if everything checked out. (TR. 26; Ex. 1; Ex. 2.) Officer Keenan stated that while he was typing up the warning citation, Defendant's records check came back. (TR. 20; Ex. 1; Ex. 2.) Officer Keenan stated that at this point, he had all the information necessary to complete the traffic stop. (TR. 27; Ex. 1; Ex. 2.) Officer Keenan testified that the records check showed that Defendant did not have any warrants and had a valid license. (TR. 26.) Officer Keenan testified that he could not obtain Defendant's criminal history because Defendant is not from the United States, but there was no information he received to indicate Defendant had a history of drug distribution. (TR. 26.)

Officer Keenan stated that as he was typing up the warning citation, he deployed his service dog, Dug, to perform an open-air sniff of Defendant's vehicle.[1] (TR. 20; TR. 27; Ex. 1; Ex. 2.) Officer Keenan testified that at the time the dog was deployed, the traffic stop had not been completed. (TR. 20, 28.) Officer Keenan did not request Defendant's permission to run Dug around the vehicle and did not request permission to search the vehicle. (TR. 27; Ex. 1; Ex. 2.) Dug sniffed the vehicle in a counterclockwise rotation beginning in the rear of the vehicle. (TR. 21; Ex. 1; Ex. 2.) Dug alerted and indicated to the odor of narcotics coming from the seam of the driver's door. (TR. 21-22; Ex. 1; Ex. 2.) The dog sniff began around fourteen minutes into the traffic stop and the sniff itself took approximately thirty-five seconds. (Ex. 1; Ex. 2.) Officer Keenan testified that prior to the dog sniff, he did not have probable cause to search the vehicle. (TR. 28.)

---

[1] Officer Keenan has had Dug since September of 2021. (TR. 21.) Dug is a certified service dog and was certified at the time of the traffic stop. (TR. 21.)

4

Following the dog sniff, Officer Kennan returned to his cruiser and explained to Defendant that in addition to making sure people were driving safe, Officer Kennan was doing criminal interdiction work to make sure people were not transporting large amounts of money, drugs, and guns. (Ex. 1; Ex. 2.) Officer Keenan asked Defendant if he had large amounts of money or guns in his vehicle. (Ex. 1; Ex. 2.) Defendant said he did not. (Ex. 1; Ex. 2.) Officer Keenan asked Defendant if he had any drugs in his vehicle. (Ex. 1; Ex. 2.) Defendant said he did not, but that he had a cigarette vape. (Ex. 1; Ex. 2.) Officer Keenan asked Defendant if anyone gave him anything to transport to New York or Canada. (Ex. 1; Ex. 2.) Defendant replied that no one did and, when asked by Officer Keenan, stated he was responsible for everything in the vehicle. (TR. 22; Ex. 1; Ex. 2.) Officer Keenan then asked Defendant if there was any reason why the drug dog would indicate to the odor of narcotics in the vehicle and Defendant said no. (Ex. 1; Ex. 2.) Officer Keenan told Defendant that he was going to look inside Defendant's vehicle and if nothing was inside, Defendant would be "golden." (Ex. 1; Ex. 2.) Officer Keenan told Defendant his travel itinerary was odd. (TR. 15-16; Ex. 1; Ex. 2.) Defendant acknowledged he could have gotten a flight cheaper than the price of the car rental. (TR. 15-16; Ex. 1; Ex. 2.)

Following the dog sniff while Officer Keenan was in the cruiser with Defendant, Omaha Police Officer Aaron Anderson arrived on the scene. (TR. 22; Ex. 1; Ex. 2.) Officer Keenan testified that as he was in the cruiser, he was able to see Officer Anderson open the trunk of the Maxima. (TR. 22; Ex. 1; Ex. 2.) Officer Keenan testified that as he was seated in the cruiser, he saw boxes in the trunk of the Maxima. (TR. 22; Ex. 1; Ex. 2.) Officer Keenan asked Defendant what was in the back of his vehicle and Defendant responded he did not know because he picked it up from a friend. (TR. 22; Ex. 1; Ex. 2.) Officer Keenan then exited the cruiser, put Defendant in handcuffs, and told Defendant he was being detained. (Ex. 1; Ex. 2.) Defendant was placed back in the front seat of the cruiser. (Ex. 1; Ex. 2.) Officer Keenan then went to the back of the Maxima with Officer Anderson, and they located bricks of a substance they believed to be cocaine in a box in the trunk. (TR. 22-23; Ex. 1; Ex. 2.) A field test was performed, and the substance tested presumptively positive for cocaine. (TR. 22-23.) Ultimately, fifty kilos of cocaine was located and booked into property. (TR. 22-23.)

Officer Keenan testified that his sole reason for becoming suspicious of Defendant was his travel plans because his itinerary did not make sense. (TR. 28.) Officer Keenan testified that he

5

noted several significant things during the traffic stop. (TR. 16.) Officer Keenan testified that the rental agreement caught his attention because it was a one-way rental agreement from Los Angles to New York. (TR. 16.) Officer Keenan testified that, in his experience, average motorists who fly across country fly back to their original location, rather than drive because it makes more sense to fly than make a forty-hour car trip. (TR. 16.) Officer Keenan also stated that Defendant's statement that it was too long to drive from Toronto, Canada to Los Angeles, but okay to drive from Los Angeles to New York was odd because it is a longer drive from Los Angeles to New York. (TR. 16-17.) Officer Keenan testified that he also found it odd that Defendant only met his cousin for a few hours (less than a day) before he drove across the country to New York. (TR. 17; TR. 20.) Officer Keenan testified that he found it suspicious that Defendant flew to California to see his cousin, but did not stay with his cousin, and did not meet with his cousin until the next day, which was the day he left California. (TR. 20.) Officer Keenan testified that he also found it suspicious that his cousin did not pick him up from the airport. (TR. 20.) Officer Keenan testified that he found it significant that Defendant originally stated he was in California for three days, then changed it to two days, because when people do not want to be truthful with their itinerary, they make up blanket stories that fall apart when asked questions. (TR. 18.) Officer Keenan further testified that he has concerns about vehicles coming from the southwest that are driving across the country because it is a known drug route. (TR. 18.) He stated that a large amount of narcotics come from the Las Vegas/southern California border area, along with the northern California area. (TR. 18.)

Officer Keenan also testified that it appeared Defendant had been doing some hard driving, meaning, driving nonstop between two points. (TR. 18-19.) Officer Keenan stated that this is a significant indicator of criminal activity because individuals doing this want to get from the beginning of their trip to their destination without stops, whereas normal motorists would drive six to eight hours and stop at a hotel and take their time. (TR. 19.) Officer Keenan explained he believed Defendant was engaged in hard driving based on Defendant's travel time. (TR. 19.) Officer Keenan stated that from where Defendant was stopped at 10:00 a.m., he was nineteen hours from Las Vegas, which would mean to would have left Las Vegas around 3:00 p.m. our time the day before, or 1:00 p.m. Las Vegas time. (TR. 19.)

Officer Keenan acknowledged on cross-examination that four days is a reasonable amount of time to drive from California to New York. (TR. 30.) He also acknowledged that he did not ask Defendant any questions about his cousin's living situation or how far his cousin lived from the airport. (TR. 31-32.) Officer Keenan stated that some people prefer driving over flying so will pay the extra cost of driving. (TR. 37.) Officer Keenan also testified that there are hotels off the exits on I-80 so individuals would not have to drive long to find a hotel. (TR. 37.) Officer Keenan acknowledged that he did not observe that the vehicle had a "lived-in" look or that there was a large amount of fast-food wrappers in the vehicle. (TR. 25.) Officer Keenan also testified that Defendant did not appear to be nervous during the encounter. (TR. 25.)

## DISCUSSION

Defendant requests that the Court suppress all evidence and statements obtained by the government during the traffic stop on July 13, 2022. Defendant does not argue that the initial traffic stop was unlawful, but rather that there was no reasonable suspicion to extend the traffic stop for a dog sniff. The undersigned disagrees.

A police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation. *United States v Andrews*, 454 F.3d 919, 921 (8th Cir. 2006) (citation omitted). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Andrews*, 454 F.3d at 921.

However, once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the necessary reasonable suspicion to justify a further detention. *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998). Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (quotation omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission" during a traffic stop typically includes "checking the driver's license, determining whether there are outstanding warrants

7

against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355. "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." Id. at 355-56.

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably [warrant] suspicion that a crime [is] being committed." Beck, 140 F.3d at 1136 (quotation omitted). In assessing whether the requisite degree of suspicion exists, a court must "determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion." Id. "The totality of the circumstances—the whole picture—must be taken into account." Id. "[B]oth innocent and criminal acts can create reasonable suspicion." United States v. Juvenile TK, 134 F.3d 899, 903 (8th Cir. 1998) (citation omitted). Also, a court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." Beck, 140 F.3d at 1136 (quotation omitted). However, an officer's suspicion must not be based on a mere "hunch," or on circumstances which "describe a very broad category of predominantly innocent travelers." Id.

Officer Keenan contends the purpose of the traffic stop had not been completed by the time the dog sniff occurred. Even though Officer Keenan acknowledged that he had all the information necessary to complete the citation, it appears from the video that Officer Keenan was still in the process of completing the warning citation when the dog sniff occurred. An officer cannot delay completing a citation just to complete a dog sniff without reasonable suspicion. See Rodriguez, 575 U.S. at 355-56. In this case, however, by the time the drug dog was deployed, Officer Keenan had reasonable suspicion of criminal activity.

Defendant's travel itinerary did not make sense, highly suggesting he was lying about his trip. Defendant said he flew to California from Canada on July 11, 2022 to see his cousin who he had never met. Defendant rented the Maxima in California at 11:00 p.m. on July 11, 2022. The Maxima was due to be returned in New York four days later—on July 15, 2022. Defendant said he met his cousin on July 12, 2022, went to the beach, went to Las Vegas for a couple hours, then started his drive to New York, and stopped and slept at a rest stop for four or five hours. This timeline is inconsistent with the purpose of his trip—to visit his cousin. At most, Defendant spent half a day with his cousin before heading back to New York. For Defendant to be pulled over at 10:00 a.m. in Nebraska on July 13, he would have had to leave California almost immediately on

July 12—leaving little time to go to the beach or Las Vegas as he said he did. This odd timeline of events supplied reasonable suspicion to extend the stop for a dog sniff. *See United States v. Gastelum*, 11 F.4th 898, 903 (8th Cir. 2021) ("[O]dd answers and strange travel plans can support a finding of reasonable suspicion"); *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021) (finding reasonable suspicion to extend traffic stop to conduct dog sniff based on incongruity between the driver's short rental period and his described travel plans).

Defendant's means of travel was likewise unusual and suspicious. Although Defendant flew to California, he decided to pay $1,005.74 to rent a car for four days so he could drive from California to New York. Defendant could have booked a flight to New York for less than he paid for his rental. *See United States v. McCarthy*, 612 F.3d 1020, 1025 (8th Cir. 2010) (finding reasonable suspicion to extend traffic stop based, in part, on the "outwardly puzzling decision to rent a car for a one-way trip at a substantial expense"). To explain his decision to drive to New York rather than fly, Defendant stated that he liked to drive. However, when Defendant was asked why he did not drive from Canada to California, he said the drive was too long, even though it is shorter than driving from California to New York. Even though Defendant's assertion that he drove to see the sights could be deemed a reasonable explanation for his decision not to fly, this does not prevent a finding of reasonable suspicion. "[E]ven facts consistent with innocent travel can, when taken together, amount to reasonable suspicion." *Gastelum*, 11 F.4th at 903.

Further, contrary to Defendant's argument, Officer Keenan's suspicion that Defendant was engaged in criminal activity was not based on a mere "hunch." Officer Keenan is an experienced officer. He has been with the Omaha Police Department for twenty-one years and has been a member of the Omaha Police K-9 Unit and the Omaha metro area interdiction team for three years. Officer Keenan testified that, in his experience, average motorists who fly across country fly back to their original place of departure, rather than drive because it makes more sense to fly than make a forty-hour car trip. Officer Keenan also testified that he found it suspicious that Defendant flew to California to see his cousin, but did not stay with his cousin, and did not meet with his cousin until shortly before he left California. Considering the totality of the circumstances, along with Officer Keenan's experience and observations of criminal behavior, the undersigned finds Officer Keenan had reasonable suspicion to extend the traffic stop to perform a dog sniff.

Accordingly,

9

**IT IS HEREBY RECOMMENDED** to Chief United States District Court Judge Robert Rossiter, Jr. that Defendant's Motion to Suppress (Filing No. 30) be denied.

Dated this 12th day of April, 2023.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.